

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed July 3, 2019**

United States Bankruptcy Judge

---

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CASE NO. 17-32865-SGJ-7 |
| KYLE MARK LAWRENCE, | § | (Chapter 7) |
| Debtor. | § | |

---

| | | |
|---|---|---|
| FROST BANK, | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | ADVERSARY NO. 18-3220-SGJ |
| | § | |
| KYLE MARK LAWRENCE, | § | |
| Defendant. | § | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW IN SUPPORT OF JUDGMENT
DECLARING DEBT OWED TO FROST BANK TO BE NONDISCHARGEABLE,
PURSUANT TO 11 U.S.C. § 523(a)(2)(A)**

## I.  INTRODUCTION

This adversary proceeding ("Adversary Proceeding") involves a Chapter 7 debtor (the

"Debtor" or "Mr. Lawrence")—a business owner—who at all relevant times has been engaged in

1

business as a commercial roofing contractor.  Frost Bank (the "Plaintiff" or "Frost Bank") was a lender to one of the Debtor's business entities on multiple loans.  Mr. Lawrence personally guaranteed the multiple loans.  There was a default on the loans.  The borrowing entity and Mr. Lawrence each filed Chapter 7 bankruptcy cases—both on July 30, 2017.

In this Adversary Proceeding, the Plaintiff seeks to establish its breach-of-contract claim against Mr. Lawrence (based on his personal guaranties) and, also, have the court declare its claim against Mr. Lawrence to be nondischargeable, pursuant to either section 523(a)(2)(A), (4), or (6) of the Bankruptcy Code.  The grounds urged are multifarious.  Among them, the Plaintiff argues that Mr. Lawrence made misrepresentations and material omissions in connection with the renewal and replacement of one of the Plaintiff's loans and otherwise committed actual fraud, by creating a new entity through which to conduct business at a time when the borrowing entity was in financial distress and becoming unable to service its debt to the Plaintiff—among other things, the Debtor transferred accounts receivable and collections of the borrowing entity, which were collateral for the Plaintiff's loans, to a new entity.  Plaintiff also argues that the Debtor committed conversion, larceny, and/or embezzlement with regard to Plaintiff's collateral.

The court held an evidentiary trial (the "Trial") in this Adversary Proceeding on May 21-22, 2019, and June 7, 2019.[1]  The court heard testimony from four different witnesses and reviewed several dozen exhibits.  The court has determined that the Plaintiff has sustained its burden of not only establishing a claim against the Debtor, based on the breach of his personal commercial guaranties, but also in establishing that the claim is nondischargeable, pursuant to section 523(a)(2)(A)—in that the Debtor made false representations, material omissions, and committed

---

[1] Since no party has ordered the transcript from the Trial, the court will cite to the audio recording from the Trial held on May 21-22, 2019 and June 7, 2019, in referring to testimony presented, in the following manner: FTR, 5/21/2019 at __:__:__.

actual fraud in connection with the Plaintiff's extension and renewal of credit and in thereafter

converting Frost Bank's collateral. The following constitutes the findings of fact and

conclusions of law in support of this ruling, as required by Fed. R. Bankr. Proc. 7052. Any

finding of fact that should more appropriately be characterized as a conclusion of law should be

regarded as such, and *vice versa*.

## II. FINDINGS OF FACT

### A. *The Original Entity Through Which the Debtor Conducted Business and the Numerous Frost Bank Loans to It.*

1. The Debtor, as of the day he filed bankruptcy, was the sole owner and member of

an entity known as Lawrence Built, LLC ("Lawrence Built"). Both the Debtor and

Lawrence Built filed separate Chapter 7 bankruptcy cases on July 30, 2017 (the "Petition

Date").

2. Lawrence Built was formed as a Texas limited liability company in 2012, and

originally went by the name of Lawrence Brothers Construction, LLC ("Lawrence

Brothers"). This is because it was originally owned by the Debtor and his brother.

3. At some point, the Debtor and his brother decided that they would no longer work

together. On November 8, 2013, Lawrence Brothers filed a Certificate of Amendment

with the Texas Secretary of State which modified the ownership and governance of the

company. Subsequently, Lawrence Brothers changed its name to Lawrence Built. On

March 17, 2016, Lawrence Built filed a Certificate of Amendment with the Texas

Secretary of State reflecting this name change.[2]

---

[2] Frost Bank Exhibit 11, p. 2.

4.  This Adversary Proceeding involves four secured promissory notes that were executed by the entity now known as Lawrence Built in favor of Frost Bank.  Three were unpaid as of the Petition Date.  For convenience and to avoid confusion, sometimes "Lawrence Brothers," n/k/a "Lawrence Built," will be referred to simply as the "Borrowing Entity."

5.  The relevant borrowing history of the Borrowing Entity, for purposes of this Adversary Proceeding, began in early 2016.  Specifically, on January 28, 2016, the Borrowing Entity obtained a loan from Frost Bank in the form of a revolving line of credit in the amount of $125,000 (the "Original Note").[3]  The Original Note was accompanied by:  (a) a Commercial Security Agreement, dated January 28, 2016, securing the indebtedness under the Original Note with a security interest in all inventory and accounts of the Borrowing Entity, then owned or thereafter acquired (which also cross-collateralized any indebtedness that the Borrowing Entity might owe then or in the future to Frost Bank), and (b) a Commercial Guaranty, dated January 28, 2016, in which the Debtor personally and continually guaranteed all of the existing and accruing indebtedness under the Original Note or succeeding indebtedness.[4]  The Original Note had a one-year maturity; thus, it was due to mature on January 28, 2017.

6.  Next, on February 4, 2016, the Borrowing Entity made, executed, and delivered to Frost Bank a Promissory Note in the amount of $46,000.[5]  The parties refer to this note as "Note 1" (which is a little confusing, since it was ***not*** the Borrowing Entity's first loan from Frost Bank—this is further explained below).  Note 1 was accompanied by two

---

[3] Debtor Exhibit I; FTR, 5/22/2019 at 2:41:30-2:41:36.
[4] Debtor Exhibit I (p. 1 of Commercial Guaranty in particular).
[5] Frost Bank Exhibit 1.

Commercial Security Agreements, contemporaneously securing the indebtedness under Note 1 with a security interest in a 2016 Chevrolet truck and a 2012 Chevrolet truck, and certain related items of the Borrowing Entity, then owned or thereafter acquired (which also cross-collateralized any indebtedness that the Borrowing Entity might owe then or in the future to Frost Bank).[6]

7.    Meanwhile, on March 22, 2016, the Borrowing Entity (n/k/a Lawrence Built) filed an Assumed Name Certificate for the name "LB Commercial Roofing."[7]  To be clear, at this time, LB Commercial Roofing was simply a "d/b/a" for Lawrence Built—not a distinct entity.  Many documents introduced into evidence at the Trial seemed to use Lawrence Built and LB Commercial Roofing somewhat interchangeably during the 2016-2017 time-frame.

8.  Then, on June 10, 2016, the Borrowing Entity made, executed, and delivered to Frost Bank a Promissory Note in the amount of $21,809.48.  The parties refer to this note as "Note 2."[8]  Note 2 was accompanied by:  (a) a Commercial Security Agreement, contemporaneously securing the indebtedness under Note 2 with a security interest in yet another 2012 Chevrolet pickup truck, and certain related items of the Borrowing Entity, then owned or thereafter acquired (which also cross-collateralized any indebtedness that the Borrowing Entity might owe then or in the future to Frost Bank),[9] and (b) a Commercial Guaranty of the Debtor, whereby he personally guaranteed, jointly and severally, the payment of all indebtedness of the Borrowing Entity owing to Frost Bank,

---

[6] Frost Bank Exhibits 2 and 3.
[7] Frost Bank Exhibit 12, pp. 2-3.
[8] Frost Bank Exhibit 4.
[9] Frost Bank Exhibit 5.

then existing or thereafter arising or acquired and even "succeeding indebtedness."[10]  For convenience, this Commercial Guaranty, dated June 10, 2016, along with the Commercial Guaranty, dated January 28, 2016, will sometimes collectively be referred to as the "Commercial Guaranties."

9.  Significantly, on January 28, 2017, the Original Note matured.  As will be explained below, an important meeting took place between Frost Bank and the Debtor in February 2017.

10.  Then, on March 15, 2017, the Borrowing Entity made, executed, and delivered to Frost Bank a Promissory Note in the amount of $123,400.00.[11] The parties refer to this note as "Note 3."  Note 3 was actually a renewal and replacement of the Original Note. The parties refer to Notes 1, 2, and 3 as such, because they are the three notes that remain unpaid.  To reiterate, the Original Note was renewed and replaced, after it matured, with Note 3.  Note 3 was accompanied by yet another Commercial Security Agreement, contemporaneously securing the indebtedness under Note 3 with a security interest in all inventory and accounts of the Borrowing Entity, then owned or thereafter acquired, as well as related assets and rights (which also cross-collateralized any indebtedness that the Borrowing Entity might owe then or in the future to Frost Bank).[12]

11.  Frost Bank has, at all relevant times, had a perfected security interest in substantially all of the assets of the Borrowing Entity (hereinafter, the "Collateral"), by virtue of having filed a UCC Financing Statement with the Texas Secretary of State, on February 12, 2016, Filing No. 160004718724, and on March 15, 2017, Filing No.

---

[10] Frost Bank Exhibit 6.
[11] Frost Bank Exhibit 7.
[12] Frost Bank Exhibit 8.

1700088028. Frost Bank has a superior and first priority lien and security interest in all of the Collateral, which included any and all proceeds of the Collateral.[13]

**B. *The Important February 10, 2017 Meeting.***

12. On February 10, 2017, the Debtor met with an Assistant Vice President of Frost Bank named Michael Fleming ("Mr. Fleming") to discuss the transition of the Borrowing Entity's three pending loans to the "Special Assets" department of Frost Bank.[14] Mr. Fleming credibly testified that he requested the meeting to discuss the Borrowing Entity's business, customers, work, jobs in the pipeline, and invoices that would be coming due.[15] Recall that the Original Note had just matured on January 28, 2017.

13. Mr. Fleming also credibly testified that he reviewed the Borrowing Entity's underlying loan documents, financial statements, accounts receivable aging summary, and accounts receivable predictions prior to the February 10, 2017 meeting.[16]

14. Mr. Fleming further credibly testified that, at the time of the meeting, he looked at the revenue and income of the Borrowing Entity. Mr. Fleming and Mr. Lawrence discussed a decline in revenue of the Borrowing Entity from fiscal year 2015 to 2016.[17]

15. Mr. Fleming credibly testified that he determined that the Borrowing Entity was insolvent at the time of the February 10, 2017 meeting. This was based on Mr. Fleming's analysis of its balance sheet; it listed $200,000 in assets and $400,000 in liabilities.[18] Mr. Fleming naturally wanted to know if business would be improving for the Borrowing Entity.

---

[13] Frost Bank Exhibit 9.
[14] FTR, 5/21/2019 at 10:10:43-10:10:56.
[15] FTR, 5/21/2019 at 10:33:50-10:34:12.
[16] FTR, 5/21/2019 at 10:34:59-10:35:39.
[17] FTR, 5/21/2019 at 10:34:29-10:34:56.
[18] FTR, 5/21/2019 at 10:38:36-10:39:09.

16. Mr. Fleming and Mr. Lawrence discussed the accounts receivable aging summary provided by Mr. Lawrence to Frost Bank.[19]

17. Mr. Fleming and Mr. Lawrence discussed a certain project listed on the accounts receivable aging summary described as the Cresta Construction project. Mr. Fleming credibly testified that he asked how the project was going, about the relationship Mr. Lawrence had with his general contractor, and how frequently payments were being made. Mr. Lawrence expressed to Mr. Fleming that he had a good relationship with the general contractor and that Cresta was making timely payments.[20]

18. Mr. Fleming and Mr. Lawrence discussed invoice projections provided by Mr. Lawrence to Frost Bank. The projections were for invoices that the Borrowing Entity planned to issue in the future with regards to projects in which the Borrowing Entity was engaged.[21]

19. Mr. Fleming and Mr. Lawrence discussed a construction project listed in the invoice projections: the Gold's Gym project. This was actually the same as the so-called Cresta Construction project. Mr. Lawrence made representations that he expected to get paid from this project and that some proceeds from Cresta Construction accounts receivable would go towards servicing the debt of Frost Bank.[22]

20. Mr. Fleming and Mr. Lawrence discussed future business that was anticipated by and through the Borrowing Entity. Mr. Fleming credibly testified that the Debtor represented that he was actively bidding other jobs.[23]

---

[19] FTR, 5/21/2019 at 10:36:43-10:37:03; *see* Frost Bank Exhibit 15.
[20] FTR, 5/21/2019 at 10:37:55-10:38:33. To be clear, the court finds that Mr. Fleming credibly testified in all ways about the February 10, 2017 meeting.
[21] FTR, 5/21/2019 at 10:39:23-10:40:00; *see* Frost Bank Exhibit 16. This document was provided by Mr. Lawrence to Frost Bank prior to the February 10, 2017 meeting.
[22] FTR, 5/21/2019 at 10:40:22-10:41:10.
[23] FTR, 5/21/2019 at 10:41:37-10:42:02.

21. Mr. Fleming and Mr. Lawrence eventually discussed the renewal of the Original Note. Frost Bank, of course, had no obligation to renew the Original Note. It could have demanded payment on it since it had matured.[24]

22. Frost Bank did not demand payment at this time. The court finds that this was because Mr. Fleming relied on the projections[25] and other information provided to him by Mr. Lawrence at the February 10, 2017 meeting to make an analysis regarding the Borrowing Entity.[26]

23. The information and analysis led Frost Bank to believe that the Borrowing Entity would be able to service the debt to Frost Bank.[27]

24. A few days after the February 10, 2017 meeting, Mr. Fleming called Mr. Lawrence to discuss renewing and extending the indebtedness embodied in the Original Note into the new Note 3.[28]

25. Over the phone, Mr. Fleming and Mr. Lawrence discussed how much the Borrowing Entity could pay going forward. It was decided that the Borrowing Entity could pay about $3,000 a month.

26. Payments would be amortized over forty-eight (48) months. Amortization was created based on the Debtor's representation regarding how much the Borrowing Entity could pay a month to Frost Bank.[29]

27. Based upon the Debtor's representations at the February 10, 2017 meeting, including that the Debtor was bidding jobs for the Borrowing Entity, and that the Debtor

---

[24] FTR, 5/21/2019 at 10:42:03-10:42:42.
[25] Frost Bank Exhibits 15 & 16.
[26] FTR, 5/21/2019 at 10:42:46-10:43:27.
[27] FTR, 5/21/2019 at 10:43:29-10:43:34.
[28] FTR, 5/21/2019 at 10:43:50-10:44:05.
[29] FTR, 5/21/2019 at 10:44:05-10:45:01; 10:50:00-10:50:19.

expected to service the debt of Frost Bank with contracts on the accounts receivable aging summary and projections, Mr. Fleming reasonably had the impression that the Debtor expected business to improve.[30]

28. The Debtor gave no indication during this meeting that he expected to walk away from the Borrowing Entity and create a new entity through which to run his business. In fact, the Debtor made representations that he was committed to the success of the Borrowing Entity.[31] The Debtor told Mr. Fleming that he anticipated being able to pay off the debt early to Frost Bank, specifically, before the end of year.[32]

29. The court finds that Note 3 was prepared by Frost Bank (and executed by the Borrowing Entity on March 15, 2017, renewing and replacing the Original Note which had matured) as a result of the Debtor's representations to Frost Bank at the February 10, 2017 meeting and Mr. Fleming's analysis of and reliance upon those representations.[33]

30. The Borrowing Entity (and Debtor) missed the very first payment on Note 3 and all payments thereafter.

### C. The Debtor's New Business Entity.

31. On April 18, 2017—approximately one month after cheerily executing Note 3— Mr. Lawrence signed a Certificate of Formation for a new entity named "***LB Commercial Roofing, LLC***."[34] To be clear, "LB Commercial Roofing" would no longer simply be a "d/b/a" for the Borrowing Entity.[35] It would now be a newly created entity. As with the Borrowing Entity, the Debtor was and still is the sole owner and member of LB

---

[30] FTR, 5/21/2019 at 10:45:08-10:45:37.
[31] FTR, 5/21/2019 at 10:45:37-10:45:50.
[32] FTR, 5/21/2019 at 10:49:24-10:49:37.
[33] FTR, 5/21/2019 at 10:45:50-10:46:06.
[34] Frost Bank Exhibit 13; FTR, 5/21/2019 at 11:09:48-11:09:59.
[35] *See* paragraph 7, *supra.*

Commercial Roofing, LLC. For convenience, LB Commercial Roofing, LLC will sometimes hereinafter be referred to as the "New Entity." Mr. Lawrence never notified Frost Bank that he was creating and would be doing business through a new entity.

32. Also, in April of 2017—it is unclear what date and, specifically, whether it was before or after the New Entity was formed—Mr. Lawrence met with a bankruptcy attorney and decided that he and the Borrowing Entity would file for bankruptcy. The Debtor testified that he did not file bankruptcy immediately, but, rather, waited to file for approximately three months because he did not have the funds to file.[36] The court did not find this testimony credible. In fact, Mr. Lawrence had a somewhat selective memory throughout Trial. He frequently "did not know" or "did not recall" whenever asked pertinent questions.

33. In fact, the timeline here is rather startling.

34. On *February 10, 2017*, the Debtor met with Frost Bank to discuss the Borrowing Entity's financial issues and, ultimately, renewing and extending the Original Note.

35. On *March 15, 2017,* Frost Bank renewed the Original Note through Note 3 (after a dialogue with the Debtor in which the Debtor was upbeat about the Borrowing Entity's prospects). The Debtor never made a single payment on Note 3.

36. On *April 18, 2017*, the New Entity was created to engage in the very same type of commercial roofing business (which was either just before or just after Mr. Lawrence visited with a bankruptcy attorney).

---

[36] FTR, 5/21/2019 at 3:20:06-3:21:37.

37. On *July 26, 2017*, Mr. Lawrence filed an Abandonment of Assumed Name certificate, abandoning the Borrowing Entity's assumed name "LB Commercial Roofing."[37]

38. On *July 30, 2017*, the Debtor and the Borrowing Entity filed Chapter 7 bankruptcy cases, case numbers 17-32865-SGJ-7 and 17-32866-BJH-7, in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division.

**D. *Frost Bank's Claim Against the Debtor.***

39. The Borrowing Entity defaulted in the payment of Note 1, Note 2, and Note 3.[38]

40. Mr. Lawrence, as guarantor under the Commercial Guaranties, breached those Commercial Guaranties by also failing to pay the indebtedness due and owing to Frost Bank.[39]

41. There were never any payments made on Note 3, by Lawrence Built or Mr. Lawrence.[40]

42. Frost Bank made demands for payment on Lawrence Built and Mr. Lawrence by issuing a notice of default and demand in May 2017.[41]

43. The Notes and the Commercial Guaranties allowed Frost Bank to accelerate Lawrence Built's and Mr. Lawrence's obligations.[42]

---

[37] Frost Bank Exhibit 12.
[38] FTR, 5/21/2019 at 10:52:52-10:52:57; 10:53:03-10:53:28; 2:41:41-2:42:05.
[39] FTR, 5/21/2019 at 10:52:57-10:53:02.
[40] FTR, 5/21/2019 at 10:53:30-10:53:42; 2:42:25-2:42:57.
[41] FTR, 5/21/2019 at 10:55:04-10:55:29.
[42] FTR, 5/21/2019 at 10:55:54-10:56:16.

### E. *Diversion of Cresta Project and Revenue to the New Entity.*

#### a. *Cresta Project*

44. On November 11, 2016—well before the February 10, 2017 meeting—the Debtor, on behalf of the Borrowing Entity, executed a Subcontract Agreement (dated October 20, 2016) with Cresta Construction Company ("Cresta") regarding a Gold's Gym Tower Point construction project (the "Cresta Project").[43]

45. The subcontractor on the Subcontract Agreement for the Cresta Project is shown as "LB Commercial Roofing."[44] Significantly, the Subcontract Agreement for the Cresta Project was executed long before the Certificate of Formation was filed for LB Commercial Roofing, LLC.[45] At this point in time, LB Commercial Roofing was merely a "d/b/a" of Lawrence Built. Thus, the court finds that the subcontractor on this Subcontract Agreement was the Borrowing Entity.

46. The Debtor signed the Subcontract Agreement for the Cresta Project as "Founder" of the Subcontractor.[46]

47. The Cresta Project appeared on the accounts receivable aging summary and on the anticipated accounts receivable chart for the Borrowing Entity, that were each provided to Frost Bank in connection with the February 10, 2017 meeting.[47]

---

[43] Frost Bank Exhibit 21.
[44] FTR, 5/21/2019 at 3:17:00-17:07.
[45] FTR, 5/21/2019 at 3:16:14-3:16:22.
[46] FTR, 5/21/2019 at 3:16:30-3:16:38.
[47] Frost Bank Exhibits 15 and 16.

48. The court finds that the Debtor engaged in the diversion of revenue from the Cresta Project—which was Frost Bank's collateral—away from the Borrowing Entity to the New Entity.

### b. Subcontract Payment Applications

49. During early to mid-2017, various "Subcontractor Payment Applications" were sent to Cresta in connection with the Cresta Project: (a) on February 20, 2017 (in the amount of $28,567.43); [48] (b) on March 20, 2017 (in the amount of $13,898.20);[49] (c) on April 19, 2017 (in the amount of $7,086.50);[50] (d) on May 19, 2017 (two, one in the amount of $2,508.51 and one in the amount of $21,301.09); [51] (e) on July 19, 2017 (two, one in the amount of $593.65 and one in the amount of $21,367.07); [52] (f) on August 21, 2017 (in the amount of $10,650.55);[53] and (g) on August 24, 2017 (in the amount of $10,650.54). [54]

50. All of these Subcontractor Payment Applications were issued by "Lawrence Built, LLC dba LB Commercial Roofing"—*i.e.,* the Borrowing Entity.

### c. The LB Commercial Roofing, LLC Invoice

51. Although the Subcontract Agreement regarding the Cresta Project pre-dated the formation of "LB Commercial Roofing, LLC" by many months, and although all Subcontract Payment Applications were issued by the Borrowing Entity, "Lawrence Built LLC dba LB Commercial Roofing," suddenly the New Entity, LB Commercial Roofing, LLC, gets involved later on, by submitting an invoice to Cresta on September 18, 2017 in

---

[48] Frost Bank Exhibit 23, pp. 1-2.
[49] Frost Bank Exhibit 24.
[50] Frost Bank Exhibit 26, p. 2.
[51] Frost Bank Exhibit 27, pp. 2 & 5.
[52] Frost Bank Exhibit 29, pp. 2 & 5.
[53] Frost Bank Exhibit 30, p. 2.
[54] Frost Bank Exhibit 31, p. 2.

the amount of $84,109.00, indicating it was for a "skin-over."[55] The amount on the invoice submitted by the New Entity, LB Commercial Roofing, LLC, is the same amount listed on a certain Subcontract Change Order submitted by the Borrowing Entity, Lawrence Built, LLC, on August 8, 2017 (after it was in bankruptcy).[56]

52.  To be clear, the invoice submitted by LB Commercial Roofing, LLC pertains to the same building at which the Cresta Project had been ongoing for many months.[57]

### d.  Checks

53.  Frost Bank submitted into evidence copies of various checks that Cresta remitted in connection with the Cresta Project.  All of them were payable to "LB Commercial Roofing" (no "LCC" included).  For example, one in the amount of $2,508.51,[58] related to the Subcontract Payment Application to Cresta, dated May 19, 2017.[59]  There was another check in the amount of $84,109.00.[60]  The job number at the top of the remittance advice thereon, 840343074 TOWER POINT, is the same as the subcontract number on the Cresta Subcontract Agreement[61] and also appears to relate to the invoice mentioned above dated September 18, 2017.[62]  There was another check in the amount of $1,595.78.[63]  Relating to it, Cresta had received an invoice from LB Commercial Roofing, LLC requesting an amount of $1,595.78 for project number 840343074 (once again, same as the Subcontract Agreement number).[64]

---

[55] Frost Bank Exhibit 33.
[56] Frost Bank Exhibit 21, pp. DEF0472-DEF0473.
[57] FTR, 5/21/2019 at 4:27:33-4:27:52.
[58] Frost Bank Exhibit 28, pp. 1-2.
[59] FTR, 5/21/2019 at 5:57:15-5:58:00.  *See* Frost Bank Exhibit 27.
[60] Frost Bank Exhibit 34, p. 1.
[61] Frost Bank Exhibit 21 (with the exception that the number does not include the "-13" after the number; the meaning of "-13" was never identified by Frost Bank or Mr. Lawrence).
[62] Frost Bank Exhibit 33.
[63] Frost Bank Exhibit 35, p. 1.
[64] Frost Bank Exhibit 35, p. 3.

54.  The Debtor deposited all of these checks into a Wells Fargo Business Checking Account of the New Entity, LB Commercial Roofing, LLC.[65]

55.  Finally, there was another check in the amount of $21,960.93.[66]

56.  The remittance advice at the top of the page describes this check as related to August, May, and July 2017 invoices under "Invoice Date." The evidence was credible and convincing that this check (like the others) related to the Cresta Project.[67]

57.  Mr. Lawrence endorsed this check and made it payable to Frost Bank only *after* Frost Bank learned about this payment and made a demand.[68] Frost Bank applied the $21,960.93 to the indebtedness of Lawrence Built and Mr. Lawrence.[69]

58.  The Debtor has argued in this Adversary Proceeding that Lawrence Built was in Chapter 7 bankruptcy toward the end of the Cresta Project and was incapable of finishing performance under the Cresta Project (some of this project performance, indeed, straddled slightly into the post-petition period). Relatedly, he argues he just wanted a fresh start. The court does not find these defenses to be credible to overcome the indicia of fraud—particularly given the timeline of events, the fact that the Cresta contract was entered into many months prepetition, the lack of transparency toward Frost Bank, and, in fact, the willful omissions and misleading statements at the February 2017 meeting with Frost Bank.

---

[65] FTR, 5/21/2019 at 3:57:05-5:57:15; 4:05:40-4:06:05; *see also* Frost Bank Exhibit 44, p. 2; FTR, 5/21/2019 at 4:31:54-4:32:08; *see also* Frost Bank Exhibit 34, p. 5 (October 16, 2017 transaction in the amount of 84,109.00); *see also* Frost Bank Exhibit 35, p. 4 (January 24, 2018 transaction depositing $1,595.78).
[66] Frost Bank Exhibit 36, p. 1.
[67] Frost Bank Exhibit 29, p. 2; Exhibit 30; and Exhibit 31, p. 2.
[68] FTR, 5/21/2019 4:43:40-4:55:13; 4:57:47-4:59:16; *see* Frost Bank Exhibit 51, pp. 5 and 9.
[69] FTR, 5/21/2019 at 11:28:01-11:28:14.

**F. *Diversion of Trinity TransCon, LLC Project Revenue to the New Entity.***

**a. *The Trinity Project***

59. On April 17, 2017, "LB Commercial Roofing" executed a Short Form Subcontract Agreement with Trinity TransCon, LLC ("Trinity") regarding a Dunkin Donuts "356733" construction project (the "Dunkin Project").[70]

60. This Trinity contract was executed by Mr. Lawrence as "Founder" of "LB Commercial Roofing" one day before the formation of LB Commercial Roofing, LLC, on April 18, 2017—and, also, approximately one month after Frost Bank gave the renewal and extension of the Original Note into Note 3.[71] To be clear, at this point LB Commercial Roofing was still merely a "d/b/a" of the Borrowing Entity.

**b. *Payment Applications***

61. In June 2017, "LB Commercial Roofing" submitted a Payment Application to Trinity for the amount of $9,081.00.[72] A Conditional Waiver and Release Upon Progress Payment[73] was provided to Trinity for $9,081.00, made payable to "LB Commercial Roofing."

62. LB Commercial Roofing submitted a second Payment Application to Trinity for the amount of $1,009.00.[74] Mr. Lawrence, on behalf of "Lawrence Built, LLC dba LB Commercial Roofing" submitted a Conditional Wavier and Release Upon Final Payment for the amount of $1,009.00 on July 19, 2017.[75]

---

[70] Frost Bank Exhibit 37, pp. 5-7.
[71] FTR, 5/21/2019 at 4:49:48-5:01:34.
[72] Frost Bank Exhibit 37, p. 8.
[73] Frost Bank Exhibit 37, p. 10.
[74] Frost Bank Exhibit 37, p. 11.
[75] Frost Bank Exhibit 37, p. 13.

63. "LB Commercial Roofing, LLC" is not written on these payment applications. To be clear, prior to July 26, 2017, "LB Commercial Roofing" was still in effect as the assumed named of Lawrence Built.[76]

### c. Checks

64. Trinity issued a check to LB Commercial Roofing in the amount of $9,081.00 on July 17, 2017.[77]

65. Trinity issued a check to LB Commercial Roofing in the amount of $1,009.00 on August 22, 2017.[78]

66. The check in the amount of $9,081.00 was deposited into a Wells Fargo Business Checking Account of the New Entity, LB Commercial Roofing, LLC.[79]

67. The check in the amount of $1,009.00 was deposited into a Wells Fargo Business Checking Account of the New Entity, LB Commercial Roofing, LLC.

68. The court finds that both of these checks should have been paid to the Borrowing Entity, Lawrence Built, and were the Collateral of Frost Bank under its Security Agreement.[80]

---

[76] FTR, 5/21/2019 at 5:06:06-5:06:52. The assumed name of Lawrence Built, "LB Commercial Roofing," was not abandoned until July 26, 2017. *See* Frost Bank Exhibit 12.
[77] Frost Bank Exhibit 37, p. 15.
[78] Frost Bank Exhibit 37, p. 17.
[79] Frost Bank Exhibit 38, p. 2; FTR, 5/21/2019 at 5:08:50-5:09:10. The July 21, 2017 transaction includes the $9,081.00 check from Trinity.
[80] Frost Bank Exhibit 44, p. DEF0199; FTR, 5/21/2019 at 5:12:05-5:13:46.

**G. *Diversion of Cross Timbers Community Church Project and Revenue to the New Entity.***

    **a. *Letter Agreements***

        **i. *March 8, 2017.***

69. On March 3, 2017, Mr. Lawrence sent to Cliff Culwell ("Mr. Culwell") at Cross Timbers Community Church ("Cross Timbers") an email discussing a roofing project for which he was making a proposal. The signature block at the bottom of the emails shows "LB Commercial Roofing Affiliate of Lawrence Built LLC."[81] Again, the New Entity had not been formed yet. "LB Commercial Roofing" was still merely a "d/b/a" of the Borrowing Entity. A "Proposal Summary" was attached to the email and listed "Lawrence Built LLC dba LB Commercial Roofing" in the footer.[82] It was a $73,000 proposal, as to which a 50% deposit would be required and 50% would be due upon completion.

70. An actual Letter Agreement between "Lawrence Built LLC dba LB Commercial Roofing" and Cross Timbers was prepared by Mr. Lawrence and signed on March 8, 2017 regarding the roofing project.[83]

71. A Certificate of Liability Insurance, dated March 9, 2017, shows the insured party as "Lawrence Built LLC dba LB Commercial Roofing."[84] The certificate holder shown is Cross Timbers.

---

[81] Frost Bank Exhibit 39, pp. 33-34.
[82] The scope of work discussed on March 3, 2017.
[83] FTR, 5/22/2019 at 10:55:47-10:56:14; *see also* Frost Bank Exhibit 39, pp. 64-65.
[84] Frost Bank Exhibit 39, p. 38.

72. In fact, all evidence showed that the various insurance policies associated with the Debtor's business were in the name of the Borrowing Entity and the Borrowing Entity made payments thereon.[85]

73. Cross Timbers issued a check made payable to "Lawrence Built LLC, dba LB Commercial Roofing" in the amount of $36,500.  This was a half payment for the scope of work to be performed by Lawrence Built for Cross Timbers under the Letter Agreement made on March 8, 2017.[86]

74.  This check was later returned to Cross Timbers because the contract was "cancelled out" due to a storm damaging the church, causing Cross Timbers to contract for a larger scope of work on July 11, 2017.  The fact that an earlier contract with "Lawrence Built LLC dba LB Commercial Roofing" may have been superseded by another contract, with "LB Commercial Roofing" (see below), did not persuade the court that there was not a fraudulent scheme.

### ii.  July 11, 2017

75.  A new Letter Agreement was entered into between Cross Timbers and "LB Commercial Roofing" on July 11, 2017.[87]

76.  A Certificate of Liability Insurance, dated June 22, 2017, was submitted to Cross Timbers in conjunction with the Letter Agreement signed July 11, 2017.[88]

77.  As with other insurance policies, the Certificate of Liability Insurance insures the party "LB Commercial Roofing."  The document does not show "LB Commercial Roofing, LLC."

---

[85] FTR, 5/22/2019 at 11:00:07-11:03:18; *see also* Frost Bank Exhibit 39, p. 45.
[86] FTR, 5/22/2019 at 11:03:34-11:03:47.
[87] Frost Bank Exhibit 39, pp. 15-16. The assumed name was abandoned July 26, 2017.
[88] FTR, 5/22/2019 at 11:06:06-11:06:27; *see also* Frost Bank Exhibit 39, p. 143.

### b. *Checks*

#### i. *$232,006.90*

78. Cross Timbers issued a check to the Borrowing Entity, "Lawrence Built, LLC dba LB Commercial Roofing," on July 10, 2017 in the amount of $232,006.90.[89]

79. Mr. Lawrence deposited the check in the amount of $232,006.90 into a Wells Fargo Business Checking Account of the New Entity, LB Commercial Roofing, LLC.[90]

#### ii. *$116,003.45*

80. Cross Timbers issued another check to the Borrowing Entity, "Lawrence Built LLC, dba LB Commercial Roofing," on November 2, 2017—which by this point was several months post-petition—in the amount of $116,003.45.[91]

81. Mr. Lawrence deposited the check into a Wells Fargo Business Checking Account of the New Entity, LB Commercial Roofing, LLC.[92]

#### iii. *$197,862.93*

82. Cross Timbers issued another check to "Lawrence Built LLC, dba LB Commercial Roofing," on December 8, 2017—several months post-petition—in the amount of $197,862.93.[93]

83. Mr. Lawrence deposited the check into a Wells Fargo Business Checking Account of the New Entity, LB Commercial Roofing, LLC.[94]

---

[89] Frost Bank Exhibit 40.

[90] FTR, 5/22/2019 at 11:09:20-11:09:51; *see* Frost Bank Exhibit 40, p. 3 (July 12, 2017 transaction in the amount of $232,006.90).

[91] Frost Bank Exhibit 41.

[92] FTR, 5/22/2019 at 11:11:00-11:12:00; *see also* Frost Bank Exhibit 41. The transaction on November 2, 2017 was a deposit of $116,003.45.

[93] Frost Bank Exhibit 42.

[94] Frost Bank Exhibit 42, p. 3; FTR, 5/22/2019 at 11:13:07-11:13:25. Another check was issued by Cross Timbers to "LB Commercial Roofing, LLC" on December 28, 2017, for the amount of $163,327. The Debtor emphasized that this was the only check issued by Cross Timbers that was issued to the correct payee. The court does not find these defenses to be credible to overcome the indicia of fraud.

### H. Deposit into Personal Bank Account of Mr. Lawrence

84. On July 21, 2017 (nine days before the Petition Date), Mr. Lawrence transferred $30,000 from the New Entity, LB Commercial Roofing, LLC, into his own personal bank account.[95]

85. Even though this personal bank account existed prior to the Debtor filing for bankruptcy, *it was not disclosed on his Statement of Financial Affairs when he filed for bankruptcy*. The account was also *not disclosed on his December 28, 2017 amended schedules*.[96]

86. Mr. Lawrence stated that he "borrowed" or "loaned" himself the $30,000. He admitted to using the $30,000 to catch up on mortgage payments on his house. The $30,000 deposit was a personal benefit to Mr. Lawrence because it benefited his family to pay down the mortgage.[97]

### I. Conveyance of Intangible Assets from Lawrence Built to LB Commercial Roofing, LLC.

87. In addition to the checks, the court finds that the Debtor also transferred intangible assets from the Borrowing Entity, Lawrence Built, to the New Entity, LB Commercial Roofing, LLC.

88. Mr. Lawrence used the same logo for the Borrowing Entity, Lawrence Built, and for the New Entity, LB Commercial Roofing, LLC.[98]

89. Mr. Lawrence used the same telephone number (214-932-3455) for the Borrowing Entity, Lawrence Built, and the New Entity, LB Commercial Roofing, LLC. [99]

---

[95] Frost Bank Exhibit 45, p. 2.
[96] Frost Bank Exhibit 18.
[97] FTR, 5/22/2019 at 4:25:00-4:27:54.
[98] Frost Bank Exhibits 46, 47, and 48.
[99] FTR, 5/22/2019 at 11:13:31-11:16:17.

90. Mr. Lawrence used the same website address (lbcommercialroofing.com) for the Borrowing Entity, Lawrence Built, and the New Entity, LB Commercial Roofing, LLC.[100]

91. Mr. Lawrence used the same trademark ("Built to Serve") for the Borrowing Entity, Lawrence Built, and the New Entity, LB Commercial Roofing, LLC.[101] Neither this trademark (nor any intellectual property) was scheduled in the Debtor's or the Borrowing Entity's bankruptcy cases.

92. Mr. Lawrence testified multiple times that he had just wanted a fresh start and that he thought forming a new entity was a fine way of doing this. These "pure heart and empty head"-type statements were not credible. The court finds that the Debtor concealed what he was doing from Frost Bank with an intent to hinder, delay, and defraud Frost Bank. The Debtor fraudulently put Frost Bank's Collateral out of reach— soon after representing to Frost Bank that he was committed to the success of the Borrowing Entity and anticipated paying off the Borrowing Entity's debt to Frost Bank early.

### III. CONCLUSIONS OF LAW

1. Bankruptcy subject matter jurisdiction exists in this Adversary Proceeding pursuant to 28 U.S.C. section 1334(b). This is a statutory core proceeding, pursuant to 28 U.S.C. section 157(b)(2)(I), because it is a suit to determine the dischargeability of a specific debt, and because it is in the class of proceedings that can only "arise in" the context of a bankruptcy case. Thus, the bankruptcy court has statutory authority to enter a final order. Moreover, the court has determined that it has Constitutional authority to

---

[100] Frost Bank Exhibit 17.
[101] FTR, 5/22/2019 at 11:26:41-11:31:51; 6/7/19 at 10:19:29-10:22:18.

enter a final order in this matter. Finally, venue is proper before this court, pursuant to 28 U.S.C. sections 1408 and 1409.

2. Frost Bank has asserted claims against Mr. Lawrence under sections 523(a)(2), 523(a)(4), and 523(a)(6) of the Bankruptcy Code. Frost Bank bears the burden of proving, by a preponderance of the evidence, that a debt should not be discharged under 11 U.S.C. § 523(a).[102] To meet this burden, the court must find, based on the evidence, that it is more likely than not that a fact is true.[103] As a preliminary matter, the court does not find that a "willful and malicious injury" has been shown to have occurred in the case at bar by a preponderance of the evidence. Nor does the court find that a fiduciary duty existed in the case at bar. Finally, the court does not find that the Debtor's actions constituted embezzlement or larceny in the case at bar by a preponderance of the evidence.

3. However, pursuant to section 523(a)(2)(A) of the Bankruptcy Code, the court does conclude that there were "false representations" and "actual fraud" committed by Mr. Lawrence against Frost Bank that gives rise to a nondischargeable debt here.

4. Section 523(a)(2)(A) was designed to protect victims of fraud, as opposed to protecting debtors.[104] The Bankruptcy Code "affords relief only to the 'honest but unfortunate debtor,' and an individual may not obtain a discharge of debts incurred through his own wrongful conduct."[105] Yet, even in the section 523(a)(2)(A) context,

---

[102] *Grogan v. Garner*, 498 U.S. 279, 286 (1991).
[103] *Husky Int'l Elecs., Inc. v. Ritz (In re Ritz)*, 567 B.R. 715, 736 (Bankr. S.D. Tex. 2017) (quoting *Bale v. Ryan (In Re Ryan)*, 443 B.R. 395, 408 (Bankr. N.D. Tex. 2010)).
[104] *Tummel & Carroll v. Quinlivan (In re Quinlivan)*, 434 F.3d 314, 319 (5th Cir. 2005).
[105] *Trustmark Nat'l Bank v. Tegeler (In re Tegeler)*, 586 B.R. 598, 635 (Bankr. S.D. Tex. 2018) (quoting *Grogan*, 498 U.S. at 286).

"[e]xceptions to discharge are strictly construed against the creditor and liberally construed in favor of the debtor."[106]

5. Section 523(a)(2)(A) of the Bankruptcy Code states:

(a) A discharge under § 727… of this title does not discharge ***an individual debtor from any debt*** –
(2) for money, property, services, or an ***extension***, ***renewal***, or refinancing of credit, to the extent obtained by –
(A) false pretenses, ***a false representation***, or ***actual fraud***, other than a statement respecting the debtor's or an insider's financial condition."[107]

6. In the case at bar, Frost Bank has argued that Mr. Lawrence made "false representations" to Frost Bank at the time of the February 10, 2017 meeting. Frost Bank has also argued that Mr. Lawrence's actions amounted to "actual fraud." Before analyzing section 523(a)(2)(A) to determine whether it applies, the court must first determine: (1) whether a debt is owed by Lawrence Built; and, if so, (2) whether Mr. Lawrence is personally liable for the debt of Lawrence Built. After determining if a debt exists and who is obligated to pay the debt, the court can then examine whether such debt is nondischargeable under section 523(a)(2)(A).

A. *Description of the Debt Owed to Frost Bank*

7. Frost Bank has brought a breach-of-contract claim, related to the Commercial Guaranties signed by Mr. Lawrence, to recover on the three promissory notes. For Frost Bank to recover on the promissory notes, it must prove: "(1) the note in question, (2) the

---

[106] *FNFS, Ltd. v. Harwood (In re Harwood)*, 637 F.3d 615,619 (5th Cir. 2011) (citing *Hudson v. Raggio & Raggio, Inc. (In re Hudson)*, 107 F.3d 355, 356 (5th Cir. 1997)).
[107] 11 U.S.C. § 523(a)(2)(A) (2018) (emphasis added).

party sued signed the note, (3) the plaintiff is the owner or holder of the note, and (4) a certain balance is due and owing on the note."[108]

8.  The evidence shows the following: (a) Notes, 1, 2, and 3, the Security Agreements, and the Commercial Guaranties collectively contained promises to pay according to their terms; (b) Mr. Lawrence executed and delivered to Frost Bank these loan documents; (c) Frost Bank is the owner and holder of these loan documents; (d) finally, Lawrence Built defaulted on Notes 1, 2, and 3 and the Security Agreements, and $155,398.55 is due and owing to Frost Bank, plus interest, fees, and costs.

9.  Upon signing the Commercial Guaranties, Mr. Lawrence became contractually liable for the debt owing by Lawrence Built to Frost Bank.  The principal balance of Notes 1, 2, and 3 that Lawrence Built did not pay and on which Mr. Lawrence is personally liable under the Commercial Guaranties is $155,398.55.  Frost Bank is also requesting the accrued interest from June 28, 2017, the continuing accrual of pre-judgment interest, all costs incurred by Frost Bank, and all attorney's fees by Frost Bank, as provided in the loan documents.  Frost Bank approximates its damages at a total of $168,000.  This figure includes the principal, interest, and late fees on Notes 1, 2, and 3. The rate of interest used to calculate this figure is the post maturity rate of interest, set forth in the Notes, of 18%.  Additionally, there are attorney's fees.[109]

---

[108] *Bean v. Bluebonnet Sav. Bank FSB*, 884 S.W.2d 520, 522 (Tex. App.–Dallas 1994).
[109] FTR, 5/21/2019 at 11:28:57-11:31:11.

10. Having executed the Commercial Guaranties that guaranteed repayment of any amounts owed by Lawrence Built under Notes 1, 2, and 3, the court concludes that Mr. Lawrence is personally liable for the entire indebtedness owed by Lawrence Built under Notes 1, 2, and 3, *e.g.* the $168,000 debt plus attorney's fees and expenses.

**B.  Is the Debt Owed by Mr. Lawrence Nondischargeable?**

11. Having now concluded that Mr. Lawrence is personally liable to Frost Bank for the debt owed under Notes 1, 2, and 3, the court must now determine whether such debt is nondischargeable under section 523(a)(2)(A) of the Bankruptcy Code.

12. Frost Bank has argued that the entire debt is nondischargeable based upon both "false representations" made at the February 10, 2017 meeting and "actual fraud" committed in connection with a fraudulent conveyance scheme perpetuated by the Debtor, whereby he transferred the accounts receivable and intangible assets of the Borrowing Entity, Lawrence Built, to the New Entity, LB Commercial Roofing, LLC.

13. First, in order to prove that a debt is nondischargeable, due to a debtor obtaining a renewal through "***a false representation***," pursuant to section 523(a)(2)(A), a creditor must show that: (1) the debtor made representations other than a statement concerning his financial condition, (2) at the time the debtor made the representations, he knew they were false, (3) the debtor made the representations with the intention and purpose to deceive the creditor, (4) the creditor justifiably relied on such representations, and (5) the creditor sustained losses as a proximate result of the false representations.[110]  False representations need not be overt; a debtor's silence or concealment of facts can

---

[110] *In re Acosta,* 406 F.3d 367, 372 (5th Cir. 2005); *RecoverEdge L.P. v. Pentecost*, 44 F.3d 1284, 1293 (5th Cir. 1995).

constitute a fraudulent misrepresentation.[111]  However, "[d]ebts falling within the gambit

of section 523(a)(2)(A) are those obtained by fraud 'involving moral turpitude or

intentional wrong, and any misrepresentations must be knowingly and fraudulently

made.'"[112]  The required intent to deceive may be inferred from a debtor's "reckless

disregard for the truth or falsity of the statement combined with the sheer magnitude of

the resultant misrepresentation."[113]  The intent sufficient to preclude discharge may also

be "inferred where the debtor makes a false representation and knows or should know

that the statement will induce another to act."[114]  Further, "when examining a debtor's

intent under section 523(a)(2)(A), the Court is required to consider whether the

circumstances in the aggregate present a picture of deceptive conduct on the part of the

debtor, which betrays an intent on the part of the debtor to deceive his creditors."[115]

14.  Additionally, Frost Bank has also argued that its debt may be nondischargeable

under the "actual fraud" prong of section 523(a)(2)(A).  In *Husky International*

*Electronics, Inc.*, the United States Supreme Court clarified that "actual fraud" is a

separate category of section 523(a)(2)(A), distinguishable from "false pretenses" and

---

[111] *AT&T Universal Card Servs. V. Mercer (In re Mercer)*, 246 F.3d 391, 404 (5th Cir. 2001).
[112] *Provident Bank v. Merrick (In re Merrick)*, 347 B.R. 182, 186 (Bankr. M.D. La. 2006) (citing *In re Martin*, 963 F.2d 809, 813 (5th Cir. 1992)).
[113] *Acosta*, 406 F.3d at 372.
[114] *Manheim Auto. Fin. Servs., Inc. v. Hurst (In Re Hurst)*, 337 B.R. 125, 133 (Bankr. N.D. Tex. 2005).
[115] *Id.*

false representations."[116]  The Court stated that "***actual fraud***" encompasses "fraudulent

conveyance schemes, even when those schemes do not involve a false representation."[117]

15.  Looking to the evidence presented, the court ultimately concludes that the debt

owed to Frost Bank fits under false representations and actual fraud, and that the entire

amount owed by Mr. Lawrence to Frost Bank should be deemed nondischargeable

pursuant to section 523(a)(2)(A).

16.  First, the court concludes that Mr. Lawrence made false representations to Frost

Bank regarding the Borrowing Entity's, Lawrence Built's, intent to honor its payment

obligations and Mr. Lawrence's commitment to the success of Lawrence Built—when, in

fact, Mr. Lawrence intended to form the New Entity and file bankruptcy for himself and

the Borrowing Entity.  Instead of forwarding funds from the accounts receivable earned

by construction contracts that the Borrowing Entity, Lawrence Built, had entered into and

performed, these funds were deposited into a bank account of the New Entity, LB

Commercial Roofing, LLC (about which bank account Frost Bank was never informed).

---

[116] *Husky Int'l Elecs., Inc. v. Ritz*, 136 S. Ct. 1581, 1586 (2016). *Husky Int'l Electronics, Inc. v. Ritz*, 136 S. Ct. 1581, 1586-87 (2016).  In *Husky*, a creditor, Husky Electronics, Inc. ("Husky Electronics"), sold $164,000 of electronics parts to Chrysalis Manufacturing Corp. ("Chrysalis").  Chrysalis was 30% owned by one of its directors, Mr. Ritz ("Ritz").  During the time that Chrysalis was incurring debt to Husky Electronics, Ritz caused Chrysalis to transfer large monetary sums to entities that Ritz owned in whole or in part.  Husky Electronics eventually filed a lawsuit against Ritz, seeking to hold him personally responsible for Chrysalis' $163,999.38 debt. Husky Electronics argued that Ritz' intercompany-transfer scheme was "actual fraud" for purposes of a Texas law that allowed creditors to hold shareholders responsible for corporate debt.  After the lawsuit was filed, Ritz filed a Chapter 7 bankruptcy case and Husky Electronics then initiated an adversarial proceeding therein, again seeking to hold Ritz personally liable for Chrysalis' debt.  Husky Electronics also contended that Ritz could not discharge that debt in bankruptcy because the same intercompany-transfer scheme constituted "actual fraud" under section 523(a)(2)(A).  The district court held that Ritz was personally liable for the debt under Texas law, but that the debt was not "obtained by… actual fraud" as contemplated by section 523(a)(2)(A) and could be discharged in his bankruptcy.  On appeal before the Fifth Circuit, Husky Electronics argued that Ritz' asset-transfer scheme was effectuated through a series of fraudulent conveyances—or transfers intended to obstruct the collection of debt—and argued that such transfers are a recognizable form of "actual fraud."  While the Fifth Circuit disagreed, holding that a necessary element of "actual fraud" is a *misrepresentation* by the debtor to the creditor, the Supreme Court ultimately reversed the Fifth Circuit, holding that "[t]he term 'actual fraud' in section 523(a)(2)(A) encompasses forms of fraud, like fraudulent conveyance schemes, that can be effected without a false representation."
[117] *Id*. at 1586-1587.

Frost Bank justifiably relied on Mr. Lawrence to its detriment, by not exercising its right to pursue collection remedies with regard to the Original Note, after the February 10, 2017 meeting, and instead renewed it with Note 3, having been reasonably convinced that Mr. Lawrence would be servicing the debt with proceeds from the accounts receivable of the Borrowing Entity Lawrence Built.

17. The evidence further demonstrates that Mr. Lawrence knowingly created a false impression of the true facts. Mr. Lawrence represented to Frost Bank that he expected to receive funds from construction projects in which the Borrowing Entity, Lawrence Built, was engaged, and that these funds would be used towards the indebtedness owing to Frost Bank. He even represented that he hoped to pay off the debt early, when, in fact, he would not make a single payment on Note 3. Mr. Lawrence instead deposited the funds from the accounts receivable of the Borrowing Entity, Lawrence Built, into the bank account of the New Entity, LB Commercial Roofing, LLC. The false impressions of Mr. Lawrence are what induced Frost Bank to renew Note 3 instead of declaring default and accelerating the loan.

18. The court notes that false statements regarding a debtor's or an insider's **_financial condition_** must be **_in writing_**, in order to form a basis for excepting a debt (or an extension or renewal thereof) from discharge. *See* 11 U.S.C. § 523(a)(2)(A) and (B). Arguably, some of the oral statements made by the Debtor at the February 10, 2017 meeting with Frost Bank concerned the Borrowing Entity's financial condition.[118] Moreover, the Debtor did provide two **_written_** statements regarding accounts receivable

---

[118]*Lamar, Archer & Cofrin, LLP v. Appling*, 138 S. Ct. 1752 (2018) (a statement about a single asset can be a "statement respecting the debtor's financial condition"; if that statement is not in writing, then, the associated debt may be discharged, even if the statement was false).

and these appeared to be true, in that they showed accounts receivable in the pipeline that the Debtor anticipated would be collected.[119]  However, the pertinent false statements here were not regarding the Debtors' or an insider's financial condition.  The pertinent false statements were the representations that the Debtor was committed to the success of the Borrowing Entity and anticipated paying off its debts to Frost Bank early, when the Debtor obviously had different intentions—as inferable from his acts shortly after the meeting with Frost Bank.

19.  Finally, the court concludes, consistent with *Husky*, that Mr. Lawrence perpetuated a fraudulent scheme by transferring funds from the accounts receivable of the Borrowing Entity, Lawrence Built, into a bank account of the New Entity, LB Commercial Roofing, LLC, with the intent of defrauding Frost Bank as a creditor. Intangible assets were also transferred.  The Debtor basically siphoned off all assets and business from the Borrowing Entity to his New Entity—as soon as Frost Bank started turning up the heat.  Accordingly, the court finds that the approximately $168,000 debt (plus attorney's fees and costs) owed to Frost Bank is nondischargeable under section 523(a)(2)(A) of the Bankruptcy Code.

20.  The court further concludes that the Debtor should be required to compensate Plaintiff for its reasonable attorney's fees and costs incurred in trying to collect the indebtedness owed to Frost Bank and in prosecuting the causes of action in this Adversary Proceeding, and that these attorney's fees incurred by Frost Bank are not dischargeable.[120]

---

[119] Frost Bank Exhibits 15 & 16.

[120] *See McWilliams v. Nat'l Farm Life Ins. Co. (In re McWilliams)*, 610 Fed. Appx. 393, 396 (5th Cir. 2015) (per curiam) (reaffirming that a creditor that successfully contests the dischargeability of its claim in an adversary proceeding under 11 U.S.C. § 523 is entitled to recover attorney's fees if it has a contractual right to the fees under

21.  Notes 1, 2, and 3 which the Debtor guaranteed all contained provisions permitting Frost Bank to charge reasonable attorney's fees and expenses relating to collecting the indebtedness under the notes.[121]

22.  Plaintiff's counsel, in accordance with this court's instructions, submitted a post-trial "Affidavit of Attorneys' Fees"[122] on June 13, 2019, documenting its attorney's fees and costs incurred representing the Plaintiff in connection with its claims against the Debtor since January 2, 2017.  These attorney's fees and costs included those spent in connection with the bankruptcy case filed by Debtor Mr. Lawrence (Case No. 17-32865-SGJ-7) (the "Lawrence Bankruptcy"); the Adversary Proceeding; the bankruptcy case filed by the Borrowing Entity, Lawrence Built, LLC (Case No. 17-32866-BJH-7) ("Lawrence Built Bankruptcy"); and a state court lawsuit filed against the New Entity, Defendant LB Commercial Roofing, LLC, in Dallas County, Texas, on June 20, 2018 (Cause No. DC-18-08027) (the "Lawsuit").  Frost Bank is seeking its attorney's fees, for the time period of January 2, 2017 through June 10, 2019, for the legal services provided by its law firm Adams, Lynch & Loftin, P.C., in the amount of **$175,779.00**, plus an additional fee of $10,000.00 in the event of an unsuccessful appeal to the United States District Court, plus an additional fee of $25,000.00 in the event of an unsuccessful appeal to the Fifth Circuit Court of Appeals, plus an additional fee of $50,000.00 in the event of

---

state law); *In re Huddleston*, No. 16-31488-SGJ-7, 2017 WL 1207522, at *14 (Bankr. N.D. Tex. Mar. 31, 2017), aff'd, No. 16-31488-SGJ-7, 2018 WL 1182902 (N.D. Tex. Mar. 6, 2018) (creditor was awarded attorney's fees in the amount of $443,479.52 in nondischargeability action stemming from fraudulent scheme perpetuated by debtor and contractual obligation between the parties); *Schwertner Backhoe Servs. v. Kirk (In re Kirk)*, 525 B.R. 325, 330 (Bankr. W.D. Tex. 2015) (attorney's fees of creditor were recoverable under Tex. Civ. Prac. Rem. Code § 38.001(2) for establishing debt for labor performed as part of nondischargeability action); *Ward Family Found. v. Arnette (In re Arnette)*, No. 09-38643-BJH-7, 2011 WL 3651294, at *4 (Bankr. N.D. Tex. Aug. 18, 2011) (attorney's fees of creditor were recoverable in claims related to breach of note and section 523 nondischargeability claim).

[121] Frost Bank Exhibits 1, 4, & 7 (each on p. 2).

[122] Docket Entry # 88 in Adversary Proceeding.

an unsuccessful appeal to the United States Supreme Court. Frost Bank further has anticipated that it will incur additional fees in the amount of $3,500.00 as a result of the law firm of Adams, Lynch & Loftin, P.C., addressing any outstanding issues related to its Affidavit, replying to any response filed by the Debtor regarding the Affidavit, or any other pleading filed by the Debtor, and preparing for and attending any additional hearing before the court related to this Affidavit or the Lawrence Adversary. This reflects **664.55** hours of time so far. Frost Bank is also seeking its legal expenses for the time period of January 2, 2017 through June 10, 2019. The total amount of legal expenses incurred by Frost Bank is **$9,203.19**. The billing rates charged by Frost Bank's attorneys ranged from $225.00 per hour to $295.00 per hour, and a law clerk employed by Adams, Lynch & Loftin, P.C., also performed legal services in this matter at his billing rate of $100.00 per hour.

23. The Affidavit of Attorney's Fees indicated that the Adversary Proceeding has been "exceptionally novel and difficult. The facts and legal issues regarding the nondischargeability issues are complex and have involved additional effort and time."

24. Counsel for the Debtor filed an objection[123] to these fees and costs on June 20, 2019. Debtor argues that Plaintiff's counsel simply overworked this case. Acknowledging that the Plaintiff's attorney is a fine one, and his rates are very reasonable, the Debtor nevertheless argues that the hours incurred in this case represent a gross overbilling.

25. The court has reviewed the attorney's fees and objections and disagrees that there was anything particularly novel or difficult about the Adversary Proceeding or two

---

[123] Docket Entry # 89 in Adversary Proceeding.

bankruptcy cases.  Thus, the court agrees, to some extent, with the objection that there was some "overbilling."  But, not that much.  The situation is largely of the Debtor's own making.  The Debtor initially resisted discovery.  The Debtor also testified at Trial a remarkable number of times with the words "I don't know" or "I don't recall" or similar words to that effect—which not only strained credulity, but also made testimony at Trial (and no doubt during depositions and other examinations) drag on for far longer than necessary.  Given the contentiousness of this matter, and the fact that the Debtor appeared to resist discovery, and also resisted candidly answering questions frequently, the court believes the time incurred was mostly reasonable and necessary under the circumstances of this litigation, when evaluated under the factors articulated by *Johnson v. Georgia Highway Express, Inc.* and its progeny.  488 F.2d 714 (5th Cir. 1974).  On balance, the court concludes that a 10% **discount** on the fees sought by Frost Bank would be reasonable.  A 10% discount applied to the $175,779.00 sought ($17,577.90) would yield **$158,201.10** of fees.  The court concludes that the expenses sought of **$9,203.19** were reasonable and necessary.  All adjustments/estimates for future appeal and time and expense in this Adversary Proceeding are reasonable and allowed as well.

    26.  A separate judgment shall be submitted by Frost Bank that is consistent with these Findings and Conclusions.

    **###END OF FINDINGS OF FACT AND CONCLUSIONS OF LAW###**